UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

EASTSIDE MEDICAL RADIOLOGY, PLLC,
D/B/A CARNEGIE HILL RADIOLOGY, D/B/A
ADVANCED CARDIOVASCULAR IMAGING

               Plaintiff,

-against-

CARECORE NATIONAL, LLC, CARECORE
MANAGEMENT SERVICES INC., CCN IPA,
INC., CCN IPA-O, LLC, CCN IPA-M, LLC,
CCN-HI IPA, LLC, CCN-WNY IPA, INC.,
EAST RIVER MEDICAL IMAGING, P.C.,
ERMI INVESTORS GROUP, LLC,
NEW YORK MEDICAL IMAGING
ASSOCIATES, P.C.

               Defendants.

-------------------------------------------------------------x

JUDGE BATTS

COMPLAINT

# 11-CIV-9494



Plaintiff, by its undersigned attorneys, Constantine Cannon LLP, bring this civil action against the defendants named herein, and alleges as follows:

TABLE OF CONTENTS

JURISDICTION AND VENUE ................................................................................ 5

THE PARTIES ......................................................................................................... 6

    A.   Plaintiff EMR ................................................................................................ 6

    B.   CareCore Defendants .................................................................................... 7

    C.   East River Defendants .................................................................................. 9

    D.   Defendant New York Medical Imaging Associates, P.C. ("Maklansky") .................... 11

    E.   CareCore's Contracts with Commercial Insurers and Providers ...................... 11

    F.   CareCore's Ownership Structure ............................................................... 13

CO-CONSPIRATORS ............................................................................................. 16

FACTUAL BACKGROUND .................................................................................. 16

    A.   Types of Diagnostic Imaging Services ....................................................... 16

    B.   The Provision of Diagnostic Imaging Services ........................................... 19

    C.   EMR's Imaging Services ............................................................................ 22

        1.   *MRI for Quantification of Valvular Disease* ................................... 22

        2.   *Cardiac MRI Stress Testing* .......................................................... 24

        3.   *MRIs of Pacemaker/Defibrillator Patients* .................................... 24

        4.   *MRI for Determination of PFO* ...................................................... 25

        5.   *MRI for Determination of Myocardial Iron Overload* ................... 26

        6.   *Specialized Expertise in Cardiac MRI, CT and CTA Imaging* ........ 26

        7.   *Low-dose Radiation Coronary CTA* .............................................. 26

    D.   CareCore's Exclusion of EMR ................................................................... 27

    E.   CareCore Designated EMR as a Cardiac CT Specialty Center ..................... 31

    F.   CareCore's Approval of East River's New Facility Next to EMR ............... 33

ANTICOMPETITIVE CONDUCT .......................................................................... 36

    A.   CareCore and Its Radiologist-Owners Conspired to Boycott EMR and Competing Radiology Providers ................................................................................... 36

    B.   CareCore and its Radiologist-Owners Conspired to Allocate the Market for Radiology Services by Steering Patients to CareCore Radiologist-Owners ......................... 39

RELEVANT MARKETS .......................................................................................... 41

    A.   Product Markets ........................................................................................... 41

    B.   Geographic Market ...................................................................................... 42

MARKET POWER .................................................................................................... 43

HARM TO COMPETITION AND ANTITRUST INJURY ..................................... 44

    A.   Harm to Patients .......................................................................................... 44

i

B.    Harm to Diagnostic Providers .................................................................... 46

C.    Harm to EMR .............................................................................................. 47

D.    The Jury Finding the CareCore Harmed Competition ................................. 48

CLAIMS FOR RELIEF ....................................................................................................... 49

FIRST CLAIM FOR RELIEF .............................................................................................. 49

SECOND CLAIM FOR RELIEF ......................................................................................... 50

THIRD CLAIM FOR RELIEF ............................................................................................. 51

FOURTH CLAIM FOR RELIEF ......................................................................................... 53

RELIEF SOUGHT ............................................................................................................... 54

DEMAND FOR JURY TRIAL ............................................................................................ 55

## SUMMARY OF CLAIMS

1.       This case concerns an illegal horizontal conspiracy among a group of radiologists to boycott their competitors, including plaintiff Eastside Medical Radiology, PLLC ("EMR"), from providing outpatient medical diagnostic imaging, or radiology, services to patients throughout the State of New York.  This conspiracy has distorted the competitive landscape for these services and has harmed and will continue to harm patients, in addition to the diagnostic imaging providers the conspiracy targets.   Specifically, the conspiracy has deprived patients – particularly patients in need of cardiac imaging – access to the unique and medically necessary services of a premiere radiology practice, EMR, owned and operated by an internationally-recognized expert and innovator in diagnostic imaging, Dr. Steven D. Wolff.

2.       This conspiracy among competing radiologists has been accomplished through a company called CareCore National, LLC.  CareCore was created, owned, and controlled by these competing radiologists and their diagnostic imaging practices located throughout New York. These radiologists have included the owners of defendants East River Medical Imaging, P.C. and New York Medical Imaging Associates, P.C., both imaging practices located on the East Side of Manhattan and direct competitors to EMR.

3.       CareCore's ostensible purpose has been to contract with the largest health insurance companies – including Oxford, Aetna, HIP and Health Net – to provide "radiology benefit management services."  In effect, however, through CareCore's exclusive contracts with these insurance companies, CareCore and its owners have secured broad powers to decide which of their competitors would be allowed to become participating providers in the insurance company physician networks.  Under these contracts, any imaging practice that wished to be paid for

1

providing services to patients covered by these insurers has been required to apply to CareCore to become a participating provider in their networks.

4.      By controlling access to these large insurer networks, CareCore's radiologist-owners have been able to exclude their competitors from access to the hundreds of thousands of patients covered by those insurers, while simultaneously ensuring that only CareCore owners service those patients. Competing practices are excluded regardless of whether exclusion directly harms patients by limiting their access to unique and medically necessary services that CareCore's owners do not offer.

5.      At least five lawsuits have been filed against CareCore by imaging providers claiming that CareCore's exclusion has harmed patients by denying access to timely, unique, superior, or innovative, medically necessary imaging services that were not offered by other providers in the relevant geographic market. In *Stand-Up MRI of the Bronx, P.C. et al. v. CareCore National, LLC et al.*, 08 Civ. 2954 (LDW) (ETB) (E.D.N.Y.), on November 30, 2010, a jury found that CareCore and its owners had conspired to unreasonably restrain trade by excluding competitors that offered Upright MRI imaging – excluding these competitors despite the fact that such imaging was not available at any of the owner-provider facilities in the relevant geographic markets. The jury awarded $11.7 million in damages.

6.      On December 20, 2010, only 20 days after the jury verdict, CareCore and the New York Attorney General entered into an Assurance of Discontinuance ("AOD") to settle the Attorney General's antitrust investigation of CareCore. The AOD states that the Attorney General found CareCore's network admission process to "constitute a violation of New York law," and specifically required CareCore's owners to sell their ownership shares. It also removed their

2

ability to sit on the CareCore Management Committee or otherwise influence decisions regarding which competitors can access insurance company networks.

7.     This case concerns the identical conspiracy alleged in the previous cases and investigated by the Attorney General. It also alleges the same relevant market, market power and anticompetitive effects that have already been established by the jury in the *Stand-UP MRI* case.

8.     The only reason ever given to EMR by CareCore and its owners to justify EMR's exclusion from the insurer networks was that there was "no geographical need" for additional imaging services in the area. However, at the same time that CareCore denied EMR, it was aware that none of the owners – nor any other free-standing outpatient imaging providers in the area – offered the specialized cardiac imaging services EMR was providing.

9.     The patient need for EMR's services is demonstrated by the fact that during the time that CareCore denied EMR's application, CareCore was developing a cardiac imaging initiative that emphasized the need for specialized equipment and expertise by radiologists who sought to provide cardiac imaging services – the very same type of equipment and expertise being offered to patients by EMR at the time.

10.    Indeed, CareCore's cardiac initiative developed into a formal Cardiac Imaging Program run by a new Cardiology Department at CareCore. That department was tasked with developing the criteria for selecting a limited number of specialized cardiac imaging providers, known as Cardiac Imaging Specialists. These providers were invited to offer their highly specialized, medically necessary services to Oxford, Aetna and HIP patients.

11.    In September 2007, Dr. Wolff was specifically designated by CareCore Cardiology Department as a Cardiac Imaging Specialist and EMR a Cardiac CT  Specialty Center.

3

Upon information and belief, Dr. Wolff and EMR was the only such outpatient imaging practice to receive the designation on the Upper East Side of Manhattan at that time.

12.     Despite being recognized as a unique and specialized Cardiac Imaging Specialist by CareCore's own Cardiology Department, CareCore and its owners continued to deny EMR participation in the insurance company networks in 2007, as well as in subsequent applications throughout 2008, 2009 and 2010.

13.     Most egregiously, EMR *continues* today to be the only free-standing outpatient imaging provider to offer a number of highly specialized cardiac MRI services on the East Side of Manhattan, if not in all of New York County.  Numerous cardiologists, who regularly send patients to obtain cardiac MRIs and CTs, report that no other nonhospital outpatient center in Manhattan offers a number of the unique cardiac imaging services offered by EMR.

14.     In sum, CareCore and its owners' illegal conduct has yielded anticompetitive effects in the market for imaging services, notably by reducing the output and quality of such services and by precluding access to innovative services offered by imaging providers such as EMR.  Moreover, CareCore's boycott of competing imaging providers is not driven by any legitimate business or medically-valid purpose.  Indeed, numerous providers denied admission into the CareCore-controlled networks, such as EMR, offer unique and highly specialized medically necessary diagnostic imaging services of the highest quality.

15.     In addition to harming patients, the effect of CareCore and its owners' boycott and market allocation has been to severely limit EMR's ability to grow its non-cardiac imaging business over the last seven years.  While CareCore owners East River Medical Imaging and Maklansky Grunther have been adding facilities and scanners to their practice to scan all the excess volume resulting from EMR's exclusion, EMR has been limited to performing the cardiac

4

imaging services that neither CareCore owner is able to perform. If not for its ability to offer such specialized cardiac services, EMR would have been driven out of business.

16.      If CareCore continues to exclude EMR from CareCore-controlled insurance networks, EMR will continue to suffer harm by losing patients who are covered by those networks. More importantly, patients will continue to be deprived of EMR's unique imaging services. Some patients who are unable to access EMR's imaging services have been forced to undergo unnecessary, invasive and more expensive procedures like cardiac catheterization (which involves threading a tube through the arm, groin, or neck to the heart) and surgery.

17.      For all the above reasons, the actions of CareCore and its owners constitute a group boycott and market allocation scheme that violate federal and state antitrust laws. EMR seeks injunctive relief to remedy the ongoing harm it is suffering by having this Court require CareCore to cease its boycott and allow EMR into the insurance company networks CareCore controls. EMR also seeks damages (trebled under the law) to compensate it for its losses. CareCore has also tortiously interfered with EMR's prospective economic advantage, for which it is entitled to recover actual, compensatory, and punitive damages.

## JURISDICTION AND VENUE

18.      This Complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the federal antitrust law claims alleged herein under 15 U.S.C. § 15, and 28 U.S.C. §§ 1331, 1337, and over the state law claims under 28 U.S.C. § 1367.

19.      Defendants, through their ownership of diagnostic imaging providers and their treatment of patients, are found and transact business in this state and in this district. During a portion of the period relevant to the events alleged here, CareCore's headquarters were located in

this state, and CareCore currently maintains offices in Wappingers Falls, New York. Plaintiff EMR is located within this district, and a substantial part of the events giving rise to the claims arose here.

20.     The acts complained of herein have had, and will continue to have, substantial anticompetitive effects in this district. A substantial amount of interstate trade and commerce is involved in this case and affected by the alleged violations of antitrust law occurring within this district.

## THE PARTIES

### A.     Plaintiff EMR

21.     Plaintiff Eastside Medical Radiology, PLLC, d/b/a Carnegie Hill Radiology and Advanced Cardiovascular Imaging ("EMR"), is a New York PLLC located at 62 East 88th Street, New York, New York 10128. Founded in 2004, EMR is owned and operated by Steven D. Wolff, M.D., Ph.D. Dr. Wolff is an internationally-recognized expert and innovator in diagnostic imaging. Dr. Wolff graduated *summa cum laude* from Yale College and received his M.D. and Ph.D. from Duke University. He completed a radiology residency at Johns Hopkins Hospital and is certified in Diagnostic Radiology by the American Board of Radiology.

22.     Dr. Wolff has been the Chief of Cardiovascular MRI at Lenox Hill Hospital in Manhattan for over 10 years. He was the first Director of the National Institutes of Health's ("NIH") cardiac MRI program and has trained dozens of radiologists and cardiologists, many of whom have worked with him as fellows in his practice. Dr. Wolff has been an assistant professor of Radiology and Medicine at Columbia University since July 2007, has authored numerous articles, and is regularly invited to speak at national and international conferences regarding cardiovascular imaging.

23.     While Dr. Wolff has significantly advanced the field of cardiovascular imaging through his innovative techniques, his diagnostic imaging expertise extends beyond the heart. For example, he patented a technique called Magnetization Transfer Contrast which has been used in MRI to evaluate patients with neurological and musculosekeletal diseases.

24.     Dr. Robert Peters has been EMR's Director of CT/MR Body Imaging since 2004. Dr. Peters graduated college with honors from Stanford University. He completed a radiology fellowship program at Johns Hopkins University and is board certified in diagnostic radiology. Dr. Peters has been an assistant clinical professor in Columbia University's Department of Radiology since 2007. He has published and presented regarding the use of and techniques involved in cardiac CT/CTA. Dr. Peters has performed and interpreted thousands of cardiac CTs and MRIs and is an expert in cardiovascular imaging.

25.     As a GE MRI show-site (GE sends physicians to EMR to train on GE equipment), EMR installed state-of-the-art equipment, and has made numerous upgrades to its MRI and CT hardware and software. EMR uses a 1.5 Tesla MRI scanner that has GE's most advanced software for cardiovascular MRI, and a 64-detector CT scanner with GE's SnapShot Pulse technology that decreases cardiac CT radiation dose by up to seventy percent (70%).

**B.     CareCore Defendants**

26.     CareCore National, LLC is a New York limited liability company with offices in Wappingers Falls, New York, and Bluffton, South Carolina. Its ostensible purpose is to act as a Radiology Benefits Management ("RBM") company to contract with physicians and third party insurance companies to manage their radiology benefits and provide reimbursement to qualified diagnostic imaging providers that serve insurers' subscribers (*i.e.*, patients). CareCore has combined and conspired with the radiologists that own and control it in the unlawful acts alleged herein.

7

27.     Founded as Hudson Imaging Network in 1994 by a group of radiologists, CareCore's corporate evolution began in 1995 with the formation of New York Medical Imaging, PLLC ("NYMI"). NYMI was formed for the purpose of contracting with health insurance companies to manage radiology benefits for outpatient diagnostic imaging services.

28.     In its initial stages, NYMI approached a small group of geographically-selected radiologist providers to invest money and become members (*i.e.*, owners). In its solicitations of these providers, NYMI represented that its ultimate goal was to consolidate and control commercial insurance company reimbursement of diagnostic imaging services in New York.

29.     NYMI was thereby founded and controlled by a small, handpicked group of practicing radiologists who owned and operated their own independent diagnostic imaging practices. These radiologist-owners sat on NYMI (now CareCore) boards and approved themselves as for-profit providers in NYMI (now CareCore) controlled networks.

30.     Defendant CareCore Management Services Inc. ("CMS") was a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. According to records of the New York Department of State, Division of Corporations, CMS was dissolved in September 2010. Upon information and belief, CMS combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

31.     Defendant CCN IPA, Inc. (formerly known as New York Medical Imaging IPA, Inc. until a name change in July 2006) is a New York corporation with a principal place of business in Bluffton, South Carolina. Upon information and belief, CCN IPA, Inc. combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

32.     Defendant CCN IPA-O, LLC (formerly known as NYMI IPA-O, LLC until a name change in November 2006) is a New York limited liability company with a principal place of

8

business at 169 Myers Corners Road, Wappingers Falls, New York. Upon information and belief, CCN IPA-O, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

33.     Defendant CCN IPA-M, LLC (formerly known as NYMI IPA-M, LLC until a name change in November 2006) is a New York limited liability company with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. Upon information and belief, CCN IPA-M, LLC combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

34.     Defendant CCN-HI IPA, LLC is a New York limited liability company with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. Upon information and belief, CCN-HI IPA, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

35.     Defendant CCN-WNY IPA, Inc. is a New York corporation with a principal place of business at 169 Myers Corners Road, Wappingers Falls, New York. Upon information and belief, CCN-WNY IPA, Inc. has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

36.     Carecore National, LLC, CMS, New York Medical Imaging IPA, Inc., NYMI IPA-O, LLC, CCN IPA-O, LLC, NYMI IPA-M, LLC, CCN IPA-M, LLC, CCN-HI IPA, LLC, CCN IPA, INC., CCN-WNY IPA, Inc. are referred to collectively as CareCore.

**C.     East River Defendants**

37.     Defendant East River Medical Imaging, P.C. is a radiology practice with 5 offices in Manhattan, New York.

9

38.     East River has offices located at 515 East 72nd Street, New York, New York; 519 East 72nd Street, New York, New York; 523 East 72nd Street, New York, New York; 3 East 75th Street, New York, New York; and 430 East 59th Street, New York, New York.

39.     Upon information and belief, East River Medical Imaging, P.C. is owned and operated by the radiologists associated with the practice.

40.     Upon information and belief, East River Medical Imaging, P.C. was and/or is an owner of CareCore.

41.     East River is a direct competitor of EMR in the delivery of radiology services.

42.     Upon information and belief, East River has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

43.     Defendant ERMI Investors Group, LLC is an investment vehicle through which individuals combine and invest their money.

44.     Upon information and belief, doctors that are affiliated with East River own part of or all of the ownership interest of ERMI Investors Group, LLC.

45.     Upon information and belief, ERMI Investors Group, LLC was and/or is an owner of CareCore.

46.     Upon information and belief, ERMI Investors Group, LLC has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

47.     East River Medical Imaging, P.C. and ERMI Investors Group, LLC are collectively referred to as "East River" or "East River Medical Imaging."

48.     Dr. Morton Schneider and Dr. Richard Katz have been principals of East River Medical Imaging, P.C. and ERMI Investors Group, LLC.

**D.** **Defendant New York Medical Imaging Associates, P.C. ("Maklansky")**

49.     Defendant New York Medical Imaging Associates, P.C. ("Maklansky") is a radiology practice with an office located at 165 East 84th Street, New York, New York.

50.     Upon information and belief, Maklansky is owned and operated by the radiologists associated with the practice.

51.     Upon information and belief, Maklansky is and/or was an owner of CareCore.

52.     Maklansky is a direct competitor of EMR in the delivery of radiology services. Dr. Alain Hyman has been, upon information and belief, a principal of Maklansky.

53.     Upon information and belief, Maklansky has combined and conspired for its own benefit with other defendants in the unlawful acts alleged herein.

**E.** **CareCore's Contracts with Commercial Insurers and Providers**

54.     CareCore, through its affiliates and subsidiaries, has entered into exclusive contracts with health insurance companies to (a) manage the radiology networks they offer their subscribers (*i.e.*, patients), and (b) direct reimbursement to radiology practices that serve those subscribers.

55.     Upon information and belief, no other Radiology Benefits Management company has been owned and operated by competing radiologists.

56.     The contracts entered into between CareCore and the health care insurers it services – known as Health Services Agreements ("HSAs") – have granted CareCore broad authority to control the health plans' network of radiology providers. Specifically, CareCore has been granted the authority to: (1) review and pre-authorize procedures requested by referring physicians; (2) determine whether a particular provider will be approved as part of the insurers' networks CareCore controls – and thus be permitted to serve insurers' subscribers; and/or (3) determine which of its certified providers will be assigned or "steered" a given referral.

11

57.     CareCore has managed outpatient radiology benefits for a number of large health insurers in New York, including Oxford, Aetna, Health Net, HIP, GHI, MDNY, Healthfirst, United HealthCare, and Excellus, among others. The types of services that CareCore has provided to these plans vary according to the type of plan. For at least four of these insurance companies – Oxford, Aetna, HIP, and Health Net – CareCore has provided radiology benefits management services that include preauthorization of procedures, credentialing, establishing and maintaining provider networks, and paying provider claims. For these plans, CareCore has been responsible for establishing and maintaining the provider network. It also has established payment rates to the providers in the plans and makes the payments.

58.     Among the evidence that CareCore has been responsible for the decision regarding which free-standing outpatient diagnostic imaging facilities to admit to the networks is the recent finding of the Attorney General that, "[f]or the majority of providers in the particular CareCore [Managed Care Organization] Network, CareCore makes the determination as to which providers may be included."

59.     CareCore's authority to make such decisions has also been evidenced by the denial letters that CareCore sent to EMR and other providers. These note that the applications were reviewed and denied by *CareCore's Management Committee*. Similarly, CareCore's appeals process for practices denied access to the networks has noted that any relevant information for an appeal can be presented to *CareCore's medical directors*, and that *CareCore* – not the insurance companies – reviews its original decision, taking into consideration any new information submitted by the providers. Don Ryan, CareCore's former CEO, has admitted in sworn testimony that CareCore consults the insurers only as "a courtesy."

12

60.     Other CareCore contracts have been forms of administrative services only ("ASO") contracts, where CareCore has acted as a plan administrator.  CareCore's customers for these services have included GHI, MDNY, Healthfirst, and Excellus, among others.  Under these contracts, CareCore has provided a number of services, which can include network management, scheduling, pre-authorization, clinical certification, privileging, and quality management.

61.     Accordingly, CareCore has possessed outright control over providers' access to a substantial amount of the commercially-insured lives in counties throughout the State of New York (and the income to be derived from that access).  CareCore has implemented management contracts with Aetna, Oxford Healthcare, GHI, Healthfirst, Health Net, HealthPlus, HIP, and Horizon.

62.     CareCore has exercised its authority to review and pre-authorize treatment by requiring referring physicians to submit requests for approval for expensive radiology services such as CT, PET, CT-PET, MRI, and Nuclear Medicine scans.  Until such approval has been obtained, reimbursement for the radiology services performed is not granted.

63.     CareCore has exercised its network management authority – choosing which providers it will accept as part of the networks it controls – by having providers sign a Health Care Provider Network Participation Agreement ("Provider Agreement").  CareCore only enters into Provider Agreements with professional medical corporations and limited liability companies operating at specific geographic locations – not the individual radiologists who may own or provide services on behalf of these entities – even though a professional corporation may include several radiologists.

F.     **CareCore's Ownership Structure**

64.     CareCore is, and has historically been, owned and controlled by practicing radiologists in New York, or by professional services companies (corporations or other limited

13

liability vehicles) that provide outpatient diagnostic imaging, which in turn are owned by radiologists and radiology groups – such as East River and Maklansky. CareCore's former CEO Don Ryan has testified that practicing New York radiologists owned 55% of CareCore, and up to 65% at earlier times.

65.     CareCore has been governed by a "Management Committee," which is equivalent to a board of directors, according to CareCore's Operating Agreement. The Management Committee has overseen the operations and financials of the company, has set the compensation for and can fire CareCore's CEO, and can take any action that it deems necessary for the company. During at least part of the relevant time for this Complaint, the Management Committee was dominated by CareCore owner-radiology providers, including representatives of EMR's competitors – namely East River and Maklansky.

66.     Until at least some time in 2006, decisions as to which radiology practices would be allowed to participate in the insurance company networks CareCore controlled, as well as other matters, were formally made at meetings of CareCore's so-called "Class A Advisory Committee." This Committee consisted of the same group of CareCore owner-providers – namely Class A owners (who were required to be radiologists), and were elected by all Class A owners. The Class A Advisory Committee also had a regional component, as CareCore's practice was to ensure that there were representatives from each region in New York on the Class A Advisory Committee.

67.     One particular function of the Class A Advisory Committee was to approve or deny other competing radiology practices' requests for admission into insurance company networks that CareCore controlled. As explained by CareCore's former Chairman, Dr. Andrew Litt, there was no recusal policy for circumstances where the committee considered applications of radiology providers that were in direct competition with the practices of the CareCore owners on

the committee. The absence of a recusal policy meant that CareCore's radiologist-owners – such as those from East River and Maklansky – were able to directly vote on whether or not to allow their competitors – such as EMR – participation in insurance company networks.

68.    Upon information and belief, during at least part of the relevant time-period for this action, representatives of East River (Dr. Morton Schneider) and Maklansky (Dr. Alain Hyman) were active participants in the Class A Advisory Committee.

69.    CareCore's owner-providers colluded at their Committee meetings to deny network participation to their competitors. They also simultaneously granted themselves the opportunity to participate in every CareCore insurance contract. They would also terminate existing providers in the networks at these meetings in order to give themselves the ability to expand the numbers of sites they could open in their geographical areas.

70.    According to Don Ryan, after CareCore and its radiologist-owners were accused of conflicts-of-interest in making network admission decisions, CareCore ostensibly changed its practice some time in 2006 to one where the management team, rather than the Class A Advisory Committee, made credentialing and other management decisions. This management team was selected by and continued to report to the CareCore Board of Managers, which was dominated by practicing New York radiologists and/or was elected by New York radiologist-owners of CareCore.

71.    Moreover, at the same time that CareCore purportedly disbanded the Class A Advisory Committee it created a new committee called the Medical Advisory Committee ("MAC"). Upon information and belief, this new committee contained virtually all the same CareCore owner-providers that previously sat on the Class A Advisory Committee – including

both Drs. Schneider and Hymn -- providing them with an opportunity to continue engaging in their conspiracy.

## CO-CONSPIRATORS

72.     Upon information and belief, various persons, firms, corporations, organizations and other business entities have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance of the conspiracies. Some of these persons, firms, corporations, organizations and business entities are known and some are unknown.

73.     The aforementioned unnamed individuals and business entities include, without limitation, certain of CareCore, East River and Maklansky's executives, board members, radiologist-owners, and employees, as well as other competing diagnostic imaging providers throughout New York State.

## FACTUAL BACKGROUND

### A.     Types of Diagnostic Imaging Services

74.     Diagnostic imaging services include a variety of specialized, noninvasive diagnostic imaging procedures used in the detection, diagnosis and treatment of diseases such as heart disease, cancer, musculoskeletal trauma, stroke and neurological disorders. Such procedures include Computer Axial Tomography ("CAT or "CT") scans, Positron Emission Tomography ("PET") scans, combined PET-CT scans, Magnetic Resonance Imaging ("MRI") scans and Ultrasound scans.

75.     A CT scan is an X-Ray procedure that combines several computer generated images to create three-dimensional images of internal organs and structures of the body. Cardiac CT – also referred to as coronary Computed Tomography Angiography (CTA or CCTA) – allows for the imaging of the heart and coronary arteries to aid in diagnosing obstructive coronary artery

disease and coronary artery anomalies, assessing a cardiac mass, defining pulmonary artery anatomy prior to ablation (procedure to treat abnormal heart rhythms), and coronary vein mapping prior to pacemaker placement.

76.    The U.S. Food and Drug Administration ("FDA") and the American College of Radiology ("ACR") have identified the risk of radiation exposure from CT – an increased risk of cancer – and have emphasized the importance of keeping radiation doses during CT procedures as low as reasonably achievable. New low-dose CT technology can substantially reduce the amount of radiation exposure during a CT scan.

77.    A PET scan demonstrates the biological function of the body by generating physiologic images based on the detection of radiation from the emission of positrons from a radioactive substance administered to the patient. PET scans are used most often to detect cancer and to examine the effects of cancer therapy by characterizing biochemical changes in the cancer.

78.    The PET-CT scan integrates PET and CT technologies into a single scanner to simultaneously superimpose the function of the body (metabolic system) with the anatomy of the body (anatomic system). PET-CT images provide radiologists with a system for detecting, diagnosing and evaluating treatment for heart attacks, cancer and neurological disorders.

79.    A cardiac PET-CT scan allows the nuclear medicine images from a PET scan to be superimposed with CT to produce special views of the structure and function of the heart. These views allow the information from two different exams to be correlated and interpreted on one image, rendering more precise information and allowing for accurate diagnoses.

80.    An MRI scan generates images through the combination of a strong magnetic field, radio waves and a computer to produce images of body structures. An MRI scan is used as an accurate method of detecting heart disease, head trauma, brain aneurysms, stroke, tumors of the

brain, as well as tumors or inflammation of the spine. MRI does not use ionizing radiation (x-rays).

81.     A cardiac MRI scan generates images of the heart and blood vessels. According to the ACR and the Radiological Society of North America ("RSNA"), some of the common uses of cardiac MRI imaging include: evaluating the anatomy and function of the heart, valves, major vessels, and surrounding structures; diagnosing a variety of cardiovascular (heart and/or blood vessel) problems; detecting and evaluating the effects of coronary artery disease; planning a patient's treatment for cardiovascular problems and monitoring a patient's progress over time; and evaluating the anatomy of the heart and blood vessels in children with congenital cardiovascular disease.

82.     The ACR and RSNA also explain how, by using a cardiac MRI scan, a physician can examine the size of the heart chambers and the thickness of the heart wall; determine the extent of myocardial (heart muscle) damage caused by a heart attack or progressive heart disease; detect the buildup of plaque and blockages in blood vessels; assess a patient's recovery following treatment; and assess the heart anatomy, muscle function, heart valve function and vascular blood flow both before and after surgical repair of congenital cardiovascular disease in children.

83.     Cardiac MRI has been a particularly helpful, non-invasive, diagnostic tool for heart disease when an echocardiogram or nuclear test is equivocal or inconclusive. Some patients are poor candidates for echocardiograms or nuclear stress testing because of their weight, size, age or other factor that prevents an accurate test. Indeed, cardiac MRI in many instances may be more accurate than other tests in diagnosing and quantifying heart disease.

84.     When a cardiac MRI is unavailable, patients may have to undergo more invasive procedures like catheterization (threading a tube through the arm, groin or neck to the heart), trans-

esophageal catheterization (threading a tube down the throat to the heart) and surgery. Cardiac

MRI has been effective in avoiding unnecessary and invasive surgical procedures.

85.     Ultrasonography, or *ultrasound imaging*, relies on the use of high frequency

sound waves to create images of subcutaneous body structures including tendons, muscles, joints,

vessels and internal organs for possible pathology or lesions. Cardiac ultrasound or

echocardiography images the heart to diagnose heart disease, such as abnormalities in structure

and function of the heart chambers and valves. When an echocardiogram is equivocal, an often

alternative diagnostic tool is a cardiac CT or MRI.

### B.     The Provision of Diagnostic Imaging Services

86.     Radiologists are physicians specially trained to review and interpret medical

images for referring physicians to assist in the detection and diagnosis of diseases in patients.

Practicing radiologists are often specialized in the detection and diagnosis of diseases for which

they provide radiology services. Radiologists often categorize themselves as the "doctor's doctor"

because their primary function is to support referring physicians by providing medical advice

based on diagnostic medical images, advice which enables referring physicians to make proper

medical decisions and appropriately treat their patients.

87.     As specialty care providers, radiologists receive virtually all of their patients (and

thus income) through physician referrals. Physician referrals are obtained by cultivating good-will

in the medical community by achieving a reputation for quality of treatment and excellence of

service. Radiologists often speak with referring doctors to assist in the interpretation of images

and the proper diagnosis of the patient's illness.

88.     For radiologists, the initial capital outlay for radiographic equipment is very high

and the rate of reimbursement for services is relatively low. Consequently, margins for radiology

providers are also relatively low. As such, a provider's ability to finance the cost of equipment is dependent on treating a steady flow of patients. Referrals are therefore essential to a provider's economic survival. Radiology providers compete with one another to attract the greatest possible number of referrals from physicians.

89.     Referring physicians select a radiology provider on the basis of the nature and quality of the provider's radiologists and equipment, trust, reputation, and the ability to provide timely and coherent feedback on interpretations. Physicians refer patients to radiology providers and subsequently rely on the specialized radiologists at that provider to assist them in diagnosing their patients' condition. The quality and reliability of the radiologist and the equipment will directly impact referring physicians' ability to treat their patients.

90.     Referring physicians also choose their radiology providers on the basis of the wait time that is required of their patient by the provider. Some providers offer significantly more efficient scheduling procedures than others. They may also offer longer hours of operation, more radiologists on staff, services in various languages or a greater number of diagnostic imaging systems. The delay in getting access to a provider may be particularly important in instances where the radiology services are required to immediately diagnose or treat the patient – such as, for example, where the referring physician needs to diagnose whether the patient requires urgent surgery. The time required to schedule a routine or urgent exam can vary greatly between radiology providers – from having the patient receive a study the day he or she sees the referring physician, to having to wait days or weeks for an appointment. Such differences can strongly influence a physician's decision on which imaging provider to use.

91.     Physicians are not able to send patients to in-patient hospital centers for imaging services, and out-patient hospital centers have long wait-times – weeks or months – and are

significantly more expensive than free-standing out-patient centers such as EMR. As explained by CareCore's CEO, hospital out-patient centers can be up to ten times as expensive as free-standing facilities. Some patients with time-sensitive conditions are not able to wait for hospital imaging services. Therefore, hospitals are not a viable option for many patients.

92.     As a matter of business and professional practice, once referring physicians have selected a radiology provider that meets the above concerns and considerations, they make sure that such a provider is able to see the vast majority, if not the totality, of their patients. In addition to wanting to ensure that all their patients are treated by highly qualified radiologists, it is not administratively or economically feasible for physicians to determine whether a given radiology provider is approved to see only a portion of its patients – due, for instance, to limitations on the insurance plans the provider can accept.

93.     The effect of this process – which may be referred to as "one-stop-shopping" – is explained by CareCore in a 2007 due-diligence document it prepared for Goldman Sachs. In it, CareCore describes the advantages of one-stop-shopping for CareCore in that: "Most radiology practices, if given the option, would select to participate in all of our contracts because they are concerned that if a referring physician cannot refer all or most of his patients to a single radiology provider because they do not participate with one or more plans, *then the referring physician may start to send all of his patients to a radiology provider who participates with more or all of the payors*. This works to our advantage in the network development process." (Emphasis added.) For this reason, among others, and as CareCore admits, "the vast majority of independent radiology practices desperately want to be participating providers" with CareCore.

94.     As such, when CareCore excludes a provider from treating patients insured by several of the largest health plans in the state, referring physicians will often not develop a new

21

referral relationship, or even wish to continue an existing referral relationship, with such a provider. Because of the high volume, low margin nature of radiology providers, the loss of such a relationship can quickly spell economic ruin.

95.     In addition, physicians tend not to refer patients to providers not approved to treat patients from established health care plans – such as those in the CareCore-controlled networks – as they fear that the providers' lack of approval may reflect a failure by those providers to meet high standards of care.

### C.     EMR's Imaging Services

96.     EMR has provided a full array of MRI and CT imaging services. EMR performs neuro (brain, pituitary, cervical, thoracic, lumbar), musculoskeletal (shoulder elbow, wrist, hip, knee, ankle, foot), cardiac, vascular, neuro, chest, abdominal, pelvis, breast, MRCP (biliary tract and pancreatic ducts) MRIs. EMR has also performed cardiac, vascular and body CT imaging. EMR's imaging services are unique because EMR has provided a host of services that are not offered by other nonhospital out-patient services in Manhattan. Patients unable to receive services at EMR have been forced to get them at a hospital at a much greater cost, involving long wait times and, in some instances have been forced to undergo more dangerous and more expensive invasive procedures to obtain an accurate diagnosis and treatment.

### 1.     *MRI for Quantification of Valvular Disease*

97.     EMR has provided detailed MRI studies for use in the assessment of disease of the valves of the heart. Valvular disease often involves either a "leaky" valve or a narrowing of the valve, both of which can compromise blood flow through the heart. A physician will refer a patient for an MRI to assess valvular disease when other diagnostic tools like an echocardiogram have failed to provide a clear diagnosis.

98.     EMR assesses valvular disease by conducting a cardiac MRI flow assessment. This entails quantifying the blood that flows across the valve during the cardiac cycle. EMR has been able to determine well-accepted metrics that are key to the accurate diagnosis and treatment of valvular heart disease. In cases of valve narrowing, EMR has used the speed of blood flow across the valve to quantify how narrow the valve has become. It also has used this flow information to quantify the pressure gradient across the valve. In cases of leaky valves, EMR has used blood flow information to quantify the regurgitant volume (how much the valve is leaking). EMR has also quantified the effect of the valve disease on the size and function of the heart. With these well-accepted metrics, a cardiologist has been able to recommend or rule out valve surgery.

99.     Referring physicians consistently identify Dr. Wolff as a preeminent expert in MRI and valvular disease. Numerous referring physicians in Manhattan have identified EMR as the *only* nonhospital out-patient imaging center that accurately quantifies valvular disease in its MRI studies by providing the metrics described above. They have explained that, even some hospitals lack the software to provide the information that EMR includes in its flow assessments, and the very few hospitals that do sometimes have months-long wait times. They have also explained that EMR's flow assessments have in many instances ruled out unnecessary surgery and other potentially harmful treatment like blood thinners, thus significantly increasing patients' quality of life.

100.    Physicians have reported that, in situations where EMR's flow assessment for valvular disease was unavailable – because EMR had been excluded from CareCore and thus the patient's insurance did not cover EMR's services – they have been forced to make decisions regarding surgery and other invasive procedures without this important data. In some instances, referring physicians report having been forced to send patients for catheterization, an invasive

23

procedure involving threading a tube through the arm, groin or neck to the heart and often the only alternative to a cardiac MRI.

### 2.   *Cardiac MRI Stress Testing*

101.     EMR offers cardiac MRI stress testing. This test is used to diagnose ischemic cardiac disease ("ICD"). ICD occurs when there is inadequate blood supply to the heart muscle, usually due to narrowing of the coronary arteries. ICD is the most common cause of death in most Western countries and is a major cause of expensive hospital admissions. EMR's stress perfusion imaging provides cardiologists with information necessary to detect patients with coronary artery blockages that could benefit from bypass surgery or stent placement. Patients who are unable to obtain a cardiac MRI stress test may have to undergo nuclear stress perfusion imaging, a test requiring a substantial dose of radiation to the patient. Alternatively, the patient could have a stress echocardiogram. However, many physicians believe echocardiography has been less sensitive at detecting ICD.

102.     Upon information and belief, no other nonhospital out-patient center offers cardiac MRI stress testing within a fifteen-block radius of EMR, or in all of Manhattan. Numerous referring physicians in Manhattan have stated that EMR is the only nonhospital out-patient source for cardiac MRI stress testing. They have explained that the only other option for patients who require cardiac MRI stress testing is a hospital which typically requires a patient to wait weeks for testing (as opposed to same-day or flexible scheduling at EMR) and charge much more for the service.

### 3.   *MRIs of Pacemaker/Defibrillator Patients*

103.     EMR has been the only imaging center in New York State that performs MRIs on patients with pacemakers or defibrillators. MRI scans were long considered dangerous for patients

24

with pacemakers or defibrillators because the magnetic currents of MRI potentially could heat up the metal wires in pacemakers and defibrillators and burn the patient. EMR has been able to perform such scans. One patient, Marie Sellati, who was profiled on CBS News, had waited many months to have an MRI after multiple CT scans failed to locate a brain tumor. EMR successfully scanned her brain. Prior to EMR offering this service, pacemaker/defibrillator patients requiring MRI had to travel out of state for an MRI.

### 4. *MRI for Determination of PFO*

104.    EMR performs cardiac MRI to determine whether a patient has a patent foramen ovale ("PFO"), which is a defect in the septum (wall) between the two upper chambers of the heart, *i.e.*, a hole in the heart that failed to close naturally after birth. This is a relatively common condition that in some patients can cause reoccurring stroke.

105.    EMR is the *only* nonhospital out-patient imaging center in Manhattan that performs MRI testing for PFO. The next best alternative test has been a trans-esophageal echocardiogram which involves placing an echo-probe (tube) down a patient's throat and into the esophagus. Referring physicians have stated that cardiac MRI is a less invasive procedure and thus vastly preferable to a trans-esophageal echocardiogram. However, in instances in which patients have been covered by insurance companies that contract with CareCore – and thus are precluded from accessing EMR's services – physicians have been forced to send patients for more invasive, painful, and potentially more dangerous procedures such as a trans-esophageal echocardiogram.

25

### 5.    *MRI for Determination of Myocardial Iron Overload*

106.    EMR has also performed cardiac and abdominal MRIs to determine myocardial

and hepatic iron overload.  This test has been performed on patients with hemochromatosis, a

metabolic disorder that results in too much iron being absorbed by the gastrointestinal tract.  Left

untreated, this condition can cause a buildup of iron in the liver or heart, resulting in liver cancer or

heart failure.

107.    Upon information and belief, EMR has been the only nonhospital out-patient

imaging center in Manhattan that has been able to quantify the amount of iron in the liver or heart

to diagnose and treat hemochromatosis patients.  The principle alternative to MRI in assessing iron

buildup in the liver is repeat liver biopsies, a painful procedure involving removing liver tissue

with a needle.

### 6.    *Specialized Expertise in Cardiac MRI, CT and CTA Imaging*

108.    In addition to providing unique, highly specialized Cardiac MRI imaging services,

EMR has historically been, and continues to be, a leader in providing cardiac MRI, CT and CTA

services.  EMR on average conducts many hundreds of cardiac MRIs, CTs and CTAs per year.

Upon information and belief, no other nonhospital out-patient center in Manhattan approaches

EMR's volume of cardiac MRI, CT or CTA examinations.

### 7.    *Low-dose Radiation Coronary CTA*

109.    EMR has offered low-dose coronary CTA scans since 2007.  Low-dose coronary

CTA scans are essential in limiting ionizing radiation exposure which has been linked to an

increased risk of cancer by the American Heart Association, the Food and Drug Administration

and other authoritative sources.  For instance, prior to low-dose coronary CTA,  patients would

typically receive the same radiation dose as three hundred (300) chest x-rays. The chance of a 20

year old woman getting cancer from such a scan has been estimated to be 1 in 114.

110.     Software and equipment upgrades over the past several years have made possible

CT scans with substantially lower radiation doses than previously available.  EMR obtained GE's

low-dose Snap Shot Pulse upgrade on August 2, 2007, which reduced the radiation to EMR's CT

patients by approximately 70% from then existing scanners.  This means that patients who had a

coronary CTA, but who did not have access to this low-dose technology, would have been

expected to receive a 3-fold increase in their radiation dose.

111.     At the time it purchased its CT equipment, EMR was one of the first imaging

facilities in Manhattan to obtain the Snap Shot Pulse upgrade.  Upon information and belief, for

more than two years during the relevant time period, out-patient imaging centers within a 15-block

radius of EMR, including East River and Maklansky, did not have low-dose CT scan technology to

reduce their patients' exposure to radiation.  This meant that patients that had been covered by

insurance companies that contracted with CareCore – and thus were precluded from accessing

EMR's services – were forced to obtain CT scans that delivered substantially greater amounts of

harmful radiation than would have been available from EMR.

### D.     CareCore's Exclusion of EMR

112.     EMR first applied for inclusion in the CareCore-controlled networks on July 1,

2004.  In the July 1, 2004 letter accompanying its application – addressed to the Members of

CareCore's Board – EMR emphasized that, in addition to offering a full array of MRI and CT

imaging services, EMR had provided unique, medically necessary cardiac imaging services not

found elsewhere in the community.  For example, the letter stated that, as of July 2004, EMR

"performed several hundred adenosine stress perfusion cardiac MRI studies, principally for

patients who were not good nuclear candidates or in whom prior noninvasive stress testing was equivocal." Additionally, the letter offered information regarding Dr. Wolff's extensive training, experience and expertise, as well as EMR's state-of-the-art equipment.

113.    In response to EMR's letter and application, on August 23, 2004, CareCore wrote a letter to Dr. Wolff stating that the Management Committee reviewed EMR's application at its August 12, 2004 meeting and voted to deny EMR's application. Despite having knowledge of the unique and specialized cardiac services EMR offers, CareCore and its owners denied EMR's application on account of the purported lack of "geographic necessity" for such services, stating "the imaging services available through the current participating providers in the geographic area where your facility is situated meet or exceed the patient accessibility requirements."

114.    In assessing whether or not the geographic area in which EMR's facility was located was in need of EMR's services, CareCore used its geographic necessity criteria. As explained by CareCore's employees and as evidenced by CareCore's documents, CareCore purportedly has gauged such geographic necessity by analyzing participating providers within a particular radius of the applicant imaging-center. In Manhattan, the applicable radius is 15 blocks. The application of the geographic necessity criteria to EMR and the associated denial implies that there are other imaging providers offering substantially the same services as EMR within 15 blocks of EMR's facility.

115.    In response to CareCore's denial of EMR's July 2004 application, on October 8, 2004, Dr. Wolff appealed the denial and wrote another letter to CareCore. Dr. Wolff challenged CareCore's geographic analysis and again explained that EMR's cardiac MRI services are unique and not offered by any other out-patient practice in Manhattan, let alone within 15 blocks of EMR. In light of CareCore's statement regarding the lack of geographic necessity, Dr. Wolff requested "a

28

list of participating sites in [EMR's] geographic area that are performing stress perfusion cardiac MRI examinations."

116.    Despite Dr. Wolff's request for a list of providers offering some of the unique and specialized imaging services that EMR offers, CareCore provided no response to either his appeal letter or his request for the list of providers that purportedly offered similar services.

117.    CareCore and its owners' denial of EMR's participation applications was not the only way that CareCore interfered with EMR's participation in insurance-plan networks.  In addition to denying EMR's applications to be able to service Oxford, HIP, and Aetna patients, CareCore also used its contract with Health Net to have EMR non-renewed – *i.e.*, terminated – from the Health Net provider network.

118.    Indeed, until Health Net signed a contract with CareCore, and since it opened in 2004, EMR had been a participating provider in the Health Net network and was able to provide its services to Health Net patients.

119.    By letter dated September 1, 2006, Health Net informed EMR that it was being non-renewed as a Health Net provider effective November 1, 2006.  The termination stated that, "*in accordance with our relationship with CareCore*, Health Net is now in the process of consolidating our current radiology provider network."  (Emphasis added).

120.    The Health Net letter then used the same language used by CareCore in its denial letters to state that "[i]t has been determined that the imaging services available through the current participating providers in the geographic area where your facility is situated meet or exceed the patient accessibility requirements."

121.    Following the Health Net non-renewal, on December 6, 2006, EMR submitted a new application to CareCore for inclusion into the Oxford, Aetna, HIP, and now Health Net

networks. CareCore and its owners again denied EMR. As with the 2004 application, EMR appealed this new denial.

122.    As part of his appeal efforts, Dr. Wolff contacted CareCore's Chief Medical Officer, Dr. Michael Komarow, and again described the uniqueness of EMR's imaging services. Dr. Komarow responded that he had "no influence on who CareCore allowed in their network." This statement contradicts CareCore's Network Participation Appeal Policy, which upon information and belief requires that CareCore's Medical Directors be involved in the appeals process.

123.    In a further effort to communicate with CareCore's medical directors, on December 27, 2007, Dr. Wolff sent another letter to CareCore in connection with an application for admission, explicitly requesting to discuss the "unique aspects of [EMR's] practice with someone from [CareCore], perhaps [CareCore's] medical director." He again emphasized the unique and specialized services offered and stated that because EMR is not in the CareCore-controlled networks, some of EMR's privately insured patients must pay high out-of-pocket expenses to receive EMR's services. Indeed, "in many instances [EMR has] had to provide [its] services for free." Finally, Dr. Wolff stated that EMR has "perform[ed] services for patients who have had inadequately performed or incorrectly interpreted studies from providers that are part of [CareCore's existing] network." Despite being informed that providers in its networks were performing inadequate services, CareCore did not provide any reply to EMR's December 27, 2007 appeal letter.

124.    Having heard nothing back from CareCore, EMR submitted a new application on September 18, 2008. CareCore once again purportedly reviewed the services available to patients and again denied EMR's application on the basis of a purported lack of "geographic necessity."

30

EMR again applied to CareCore on October 1, 2009, and again provided a letter detailing the unique and specialized services it offered. CareCore continued denying EMR's application citing a lack of geographic necessity.

125.     EMR's most recent application for inclusion in the CareCore-controlled networks was submitted on September 20, 2010. By letter of November 10, 2010, CareCore once again rejected EMR's application on the basis of a purported lack of geographic necessity.

126.     Each time EMR applied, and despite the unique benefits associated with EMR, CareCore rejected EMR's application citing lack of geographic necessity for such services based on a purported analysis of current needs at the time. By the explicit terms of CareCore's letters – which referred to current geographic needs and stated EMR's file would be maintained for future consideration – CareCore did not present a permanent and final denial to EMR. Moreover, CareCore's conspiracy to exclude Flushing Imaging and other providers continued throughout the period relevant to this action.

### E.     CareCore Designated EMR as a Cardiac CT Specialty Center

127.     Contemporaneously with the repeated denials of EMR on the ground that the services it offered were not needed under CareCore's geographic necessity analysis, CareCore tasked its CMO, Dr. Komarow, to develop a new program aimed specifically at increasing the availability of precisely the specialized cardiac services offered by EMR. The goal of the cardiac initiative was to identify those cardiac imaging practices that had met the utmost quality standards, were dedicated to patient safety, and used cardiac CT and CCTA imaging procedures to improve patient care.

128.     CareCore's cardiac initiative coincided with significant development in the cardiac imaging field of which Dr. Wolff and EMR were on the cutting edge. In or around

2003/2004, the use of coronary CTA as a diagnostic technique increased as physicians used this technology to improve patient care. Dr. Wolff's expertise, experience and training in cardiac imaging – both cardiac CT and cardiac MRI – made him a leading authority in the field at the time. For example, upon information and belief, EMR was one of the first out-patient locations in the community to operate a 16-slice CT machine and was one of the first to operate a low-dose prospective gating (SnapShot Pulse) machine, both of which were state-of-the-art technologies used to perform coronary CTA services. Moreover, Dr. Wolff was actively training cardiologists and radiologists to read coronary CTA images. From 2004 through 2007 and continuing to this day, Dr. Wolff has maintained his status as a preeminent scholar and practitioner in the field of cardiac imaging.

129.     CareCore's cardiac initiative developed into a formal Cardiac Imaging Program run by a new Cardiology Department at CareCore. That department was tasked with developing the criteria that were to be used in selecting a limited number of specialized cardiac imaging providers, known as Cardiac Imaging Specialists and Cardiac CT Specialty Centers ("CTSC"). These providers were to be invited to offer their highly specialized, medically necessary services to Oxford, Aetna and HIP patients. Providers that were so designated would be allowed to scan the insurance company patients that CareCore controlled.

130.     In September 2007, Dr. Wolff was designated by CareCore Cardiology Department as a Cardiac Imaging Specialist and EMR a CSTC facility. Upon information and belief, EMR was the only out-patient imaging practice to receive the designation on the East Side of Manhattan at that time. Upon receiving these designations, EMR was qualified to perform specific, specialized procedures and Dr. Wolff was granted the ability to "supervise other physicians at [his] site performing Cardiac CT and CCTA."

131.    Despite being recognized as a unique and specialized Cardiac Imaging Specialist by CareCore's own Cardiology Department, CareCore and its owners continued to boycott EMR's participation in the insurance company networks. Despite knowing that CareCore itself recognized the unique advantages EMR offers Oxford, Aetna, HIP and Health Net patients, CareCore and its owners refused to make EMR a participating provider, thereby denying those patients access to potentially life saving services for the sole purpose of maximizing their profits.

132.    Most egregiously, EMR *continues* today to be the only free-standing out-patient imaging provider to offer a number of highly specialized cardiac MRI services on the East Side of Manhattan, if not in all of New York County. Numerous cardiologists, who regularly send patients to obtain cardiac MRIs and CTs, report that no other nonhospital out-patient center in Manhattan offers a number of the unique cardiac imaging services offered by EMR. Still CareCore and its owners claim that there is simply no "geographic need" for such services.

### F.    CareCore's Approval of East River's New Facility Next to EMR

133.    While CareCore's Management Committee was denying EMR's requests to become a participating provider on the grounds that there was no geographic need for its unique and specialized services, it was *simultaneously* granting participation in those very same networks to a new East River facility located within 15 blocks of EMR.

134.    Indeed, the Management Committee's approval of East River opening a new facility was at the same time that EMR was being denied its application on the ground that there was no "geographic need" for its services. The Management Committee simultaneously held that there was *no* geographical need for EMR's services, but that there *was* geographic need for its owner's services within the exact same geographic radius. The new facility that East River sought to have approved was located at 3 East 75th Street – approximately 13 blocks from EMR's facility.

33

135.     Moreover, the approval for East River's new site was not for an existing, operating site. Nor, upon information and belief, was it for a site that would be offering the type of unique and specialized cardiac services that EMR offered. Rather, the approval was a "conditional" approval for a new site that East River was planning on opening, but had not yet opened.

136.     Indeed, upon information and belief, East River obtained an extension of its conditional approval in late 2005 because it was unable to get its facility up and running. At the same time that the Management Committee was approving an extension of the East River approval, it continued to deny EMR's appeals and new applications, despite the fact that EMR was actually offering the services that East River was not yet ready to offer, and despite the fact that EMR offered specialized cardiac services that no other free-standing out-patient practice offered in the area.

137.     East River was finally able to open its location on East 75th Street in May 2007 – almost three years after obtaining CareCore approval in August 2004, and almost three years after EMR's original application was denied.

138.     East River's ability to have a new facility CareCore-approved while simultaneously keeping its direct competitors, such as EMR, out of the CareCore-controlled insurance company networks, exemplifies the working and effect of its conspiracy with CareCore and the other radiologist-owners.

139.     Direct evidence supporting the existence and nature of this conspiracy is a series of emails written by Dr. Schneider about his experience of how the CareCore Management Committee worked.

140.    The emails were sent to all East River radiologist partners – all of whom are also stakeholders in CareCore.

141.    In the first email in the chain, dated February 1, 2006, Dr. Greenberg recommended that the partnership acquire a radiology practice in Flushing, Queens that was "going out of business" because CareCore would not admit it to their networks.

142.    He wrote:

> My dad has a friend who owns a free standing imaging center in Queens near NYH Queens hospital, formerly Booth Memorial.  We had looked at this practice many years ago when John was here and decided at that time it wasn't right for us.  It has been a successful, profitable, growing practice until now. *They are currently losing money because CareCore won't accept them as providers* as they are entrepreneurially owned.  It sounds like it is only a matter of time before they are out of business. *He is looking to sell the practice to a radiology group who can get a CareCore contract.*  I don't know details about what equipment the practice has or how much he is asking, but I think this could be potentially be acquired at a bargain "going out of business" price . . . . (Emphasis added.)

143.    Dr. Schneider then responded to Dr. Greenberg: "Any practice near NYH Queens is *CareCore controlled by Bill Wolff's group.*  Therefore CareCore will not approve a second practice in that area." (Emphasis added. Note: Bill Wolff is not related to Dr. Steven Wolff.)

144.    Dr. Duke then asked Dr. Schneider if he was "100% sure" that CareCore would not permit East River to compete in Queens.  He suggests "asking Don Ryan," former Chairman and CEO of CareCore, for permission to acquire the Queens practice.

145.    Dr. Schneider, however, rejected that notion because of the futility of asking for CareCore's approval to compete in an area that was already controlled by Dr. Bill Wolff and Radiology Associates of Main Street ("RAMS"): *"This group has been there as long as us and Bill Wolff is on the CareCore board.  It would be like us letting someone move onto 72 street. Trust me this is not going to happen."* (Emphasis added.)

146.    This email clearly demonstrates CareCore's incentive and ability to allocate the market for out-patient imaging services among its owner-radiologists. Specifically, it shows that there was an understanding between the members of the conspiracy to allocate that market amongst them. It also shows that the East Side area in which EMR is located was controlled by East River and Dr. Schneider. And that any practice that was going to compete with Dr. Schneider's group – such as EMR – would be denied entry to (and kicked out of) the insurance networks controlled by CareCore.

## ANTICOMPETITIVE CONDUCT

147.    CareCore is granted broad power by insurance companies to control their networks and the reimbursement of radiology services to their subscribers. CareCore and its radiologist-owners have misused this power to reduce competition in the market for radiology services throughout the State of New York and, in particular, in the Counties of New York, Queens, Kings, Richmond, Bronx, Nassau, Suffolk, Westchester, Dutchess and Albany. Specifically, CareCore and its radiologist-owners have: (1) conspired to boycott EMR and other competing providers by denying them access to CareCore-controlled networks; and (2) conspired to allocate the market for radiology services by steering patients away from competing providers and towards CareCore's radiologist-owners.

### A.    CareCore and Its Radiologist-Owners Conspired to Boycott EMR and Competing Radiology Providers

148.    As CareCore controls its health plan clients' networks of radiology providers, CareCore has the authority to determine whether a particular provider will be admitted into the networks and thus be permitted to serve subscribers of, among others, Oxford, Aetna, Health Net, and HIP.

149.     CareCore and its radiologist-owners, including, East River and Maklansky, have colluded to use their network management authority to illegally exclude competing providers such as EMR and other free standing imaging facilities from access to reimbursement from commercial insurers.  Rather than face fair market competition from providers offering innovative treatment and superior services, CareCore's radiologist-owners have used CareCore as a means to boycott competitors, thus significantly reducing competition in the market for imaging services to benefit themselves.

150.     Instead of determining whether to allow a provider into the CareCore-controlled networks by considering objective criteria such as the quality and quantity of a provider's medical staff, administrative apparatus, medical records, physical plant and medical equipment, defendants have adopted a fictitious and arbitrary geographic necessity test designed to protect radiologist-owners from competitors by excluding non-radiologist-owners from the networks it controls when useful to do so.

151.     CareCore uses geographic necessity as a pretext for denying approval to, and removing non-owner providers from, the networks it controls, while at other times ignoring the standard to promote the business interests of its radiologist-owners.  CareCore's approving repeat extensions of time (amounting to three years) for Dr. Schneider to open his East River facility – located only blocks from EMR – while at the same time rejecting EMR's applications is a perfect example.  The real reason for the denial of EMR's applications is that EMR was and continues to be a direct competitor to the influential radiologist-owners of CareCore, including East River and Maklansky.

152.     Nor does CareCore have any legitimate business or medical purpose for its conduct.  In fact, many of the providers boycotted from the CareCore-controlled networks,

particularly EMR, offer unique, medically necessary services not available in the relevant geographical area, as well as more efficient scheduling procedures, shorter waiting times and superior administrative services for patients and referring physicians.

153.    CareCore's denying EMR's application in 2007 while in the same year designating EMR a specialized cardiac imaging center is suspect particularly given CareCore's stated goal of expanding cardiac imaging for its controlled networks. As early as 2003 CareCore was undertaking a "Cardiac Imaging Initiative" to "*expand* its precertification requirements to include all cardiac imaging exams." (emphasis added). CareCore's exclusion of CTSC-designated EMR flies in the face of CareCore's plans for expansion of cardiac imaging, and further demonstrates that CareCore's conspiracy to exclude non-owner centers took priority over any expansion of services for patients.

154.    CareCore's anticompetitive boycott of EMR and other radiology providers has had the effect of depriving continuity of care to patients, as well as reducing output of innovative, state-of-the-art and timely radiology services to both patients and referring physicians who treat those patients.

155.    Providers that have been boycotted from the CareCore-controlled networks have been harmed financially. Since referring physicians require that a provider be able to accept *all* their patients – irrespective of their insurance coverage – radiology providers, including EMR, have been compelled, when possible, to perform radiology services covered by CareCore insurance companies free of charge to secure referrals from physicians for those patients not covered by CareCore-controlled health insurance plans.

**B.** **CareCore and its Radiologist-Owners Conspired to Allocate the Market for Radiology Services by Steering Patients to CareCore Radiologist-Owners**

156.    CareCore has also admitted that it has steered patients to CareCore owners through its scheduling and pre-authorization process.

157.    CareCore has admitted that from at least about June 2003 to April 2006, when a physician contacted CareCore to obtain a referral to an imaging provider, CareCore would list the names of the participating CareCore owner-providers before the names of non-owner imaging practices.

158.    While CareCore does not control admission into ASO-contracted networks, like GHI, defendants have used their control over the referral process to steer patient referrals for highly reimbursed procedures to CareCore radiologist-owners and away from non-owner providers such as EMR. In this way, CareCore owners, themselves competing providers, have further colluded to allocate the market for radiology services to the detriment of their competitors.

159.    By overriding the referring physician's prerogative to refer a patient to a high quality provider, CareCore has effectively controlled competition in the market for radiology services. By using the control of the referral process to benefit providers that are CareCore owners, defendants have allocated the market for radiology services amongst a limited group of competing radiology providers.

160.    CareCore's illegal allocation of radiology services has foreclosed competitors such as EMR and reducing output in the market for such services. The illegal conduct has also reduced innovation in state-of-the-art imaging technology and superior services to the detriment of patients and physicians who treat them.

161.    In addition, such an illegal allocation of the market for radiology services has interfered with referring physicians' exercise of their professional judgment in selecting a facility

for their patients.  It also has reduced access of both patients and referring physicians to the services of a premiere imaging center, offering superior services with expertise in cardiac imaging.

162.     Referring physicians have also complained that CareCore allocates the market for radiology services by steering referrals away from non-owner providers in three ways. First, CareCore has delayed the authorization of requested treatment referred to a non-owner provider for an unreasonable period of time without any valid justification – while conversely providing a prompt and hassle-free authorization to CareCore radiologist-owners.  Second, CareCore has falsely informed referring physicians that a non-owner provider is not part of a given plan's network and that the patient must be referred to another, CareCore radiologist-owner.  Third, CareCore has created automated referral procedures in which physicians are denied the ability to select non CareCore radiologist-owners and/or forced to select a limited number of preferred providers.

163.     CareCore has no legitimate business or medical justification for its anticompetitive conduct.  Steering does not reduce the cost of or increase the quality of services rendered.  Indeed, steering increases the cost of services rendered because CareCore pays its radiologist-owners more for the same services than it pays non-owner providers in the insurance company networks.

164.     Similarly, CareCore's claim that steering serves the needs of patients by finding them a provider close to their homes has been shown to be false by CareCore's own statements and actions.

## RELEVANT MARKETS

### A.   Product Markets

165.   There are two relevant product markets in this case: the market for out-patient medical diagnostic imaging services, and the market for commercially-insured out-patient medical diagnostic imaging services.

166.   The market for out-patient medical diagnostic imaging services is a relevant product market since few, if any, feasible alternatives exist to purchasers of such services who purchase the services as agents for their subscribers (the ultimate consumer). Such purchasers do not, for example, view cardiology or obstetric services as acceptable substitutes for diagnostic imaging services.

167.   In addition, in-patient diagnostic imaging services obtained in a hospital setting are not generally good substitutes for out-patient diagnostic imaging services provided at free-standing providers in the eyes of such purchasers. Inpatient diagnostic imaging services are typically used in emergency medical situations where immediate care is needed, and are accordingly priced at significantly higher price points than the same services provided in an out-patient setting. Doug Tardio, former President and COO of CareCore, has testified that even out-patient services rendered at hospitals "tend to be up to 10 times the cost of freestanding imaging centers."

168.   The market for commercially-insured out-patient medical diagnostic imaging services is also a relevant product market because a substantial number of consumers obtaining health care services through a commercial insurer would not be able to alternatively obtain publicly-provided insurance coverage (*i.e.*, Medicare or Medicaid) if faced with a price increase or a reduction in quality of services. For example, employers, who contract with health insurers on behalf of their employees, typically do not have the option of switching employees from a

commercial insurance plan to the publicly-sponsored Medicaid or Medicare program. Only individuals meeting specific eligibility criteria (*e.g.*, income or age restrictions) may enroll in such programs.

169.    Due to the general non-substitutability between private and public forms of insurance, out-patient diagnostic imaging services provided to commercially-insured individuals is a separate relevant product market in this case. In addition, such a market may be as narrow as the individual imaging modalities offered to commercially-insured individuals, such as MRIs, CTs, Ultrasounds, etc.

    **B.    Geographic Market**

170.    CareCore has contracts with insurers to control the networks of providers on a state-wide basis. CareCore and its owners have used these contracts to exclude competing imaging providers throughout the State of New York, and in particular, to exclude providers in the Counties in which the CareCore owners have imaging facilities.

171.    For the purposes of this action, the anticompetitive exclusion of EMR was aimed at a geographic area no larger than the County of New York. Therefore, the geographic boundary of the relevant market in this case is not larger than the geographic boundaries of New York County. The limited scope of the relevant geographic market is also demonstrated by the criteria utilized by CareCore in conducting its "geographic necessity" assessments, which in this case utilized an area with a radius of 1 mile or 15 blocks.

172.    In the *Stand-Up MRI* action, CareCore stipulated that New York, Queens, Kings, Bronx, Nassau, and Suffolk counties constituted relevant geographic markets for the alleged product markets.

173.     The geographic market is supported by the fact that most patients will not travel very far to obtain imaging services.  Most patients receive imaging services at locations that are close to their home, place of work, or referring physician's office.

174.     In addition, when purchasing diagnostic imaging services, commercial health insurers seek to contract with radiologists and providers that are in close proximity to where their subscribers live or work.  If an insurer is unable to build a local network of health care providers that offers sufficient access to its members, it will not be successful in selling its products in that geographic market.  It follows that purchasers, such as, for instance, health insurance companies that market health benefit plans to employers located in New York County, typically would not find diagnostic imaging providers located outside New York County (*e.g.*, in Brooklyn) to be acceptable substitutes for diagnostic imaging providers located in New York County.

175.     Even if such purchasers were able to market health benefit plans to employers located in New York County by, for example, offering radiology services located in other boroughs, in no case would they be successful in marketing such plans to employers by offering services outside New York City (*i.e.*, in Boston).

**MARKET POWER**

176.     Through its exclusive contracts with insurance companies, CareCore has wielded market power.  In particular, through these contracts, CareCore possesses power over prices paid to participating providers in CareCore for services rendered to patients.  Moreover, through these contracts, CareCore has excluded competition in the relevant markets.

177.     CareCore wields substantial economic power in the relevant markets because its failure to credential particular applicants, such as EMR, for entry into the Oxford, Aetna, Health Net, and HIP networks, has led to a substantial reduction in referrals that would otherwise have

43

been received for services rendered to patients covered by insurance plans other than Oxford, Aetna, Health Net, and HIP. Referring physicians prefer to send patients to a diagnostic imaging provider who can serve all or most of their patients. If an imaging provider is not admitted into the CareCore-controlled networks, or is terminated from the CareCore-controlled networks, it cannot serve the majority of a physician's patients. As a result, referring physicians will not send the majority of their patients to such a provider.

178.    CareCore's contracts with insurers cover substantial percentages of the commercially-insured lives in the relevant geographic market. These substantial shares demonstrate that CareCore commands market power over such areas.

179.    CareCore maintains its market power in light of the significant barriers to entry faced by potential competitors seeking to form a competing entity that would need to offer radiology benefit management services as well as an extensive network of imaging providers throughout the State of New York.

180.    Diagnostic imaging providers located in the relevant market that are not members of CareCore-controlled provider networks are effectively foreclosed from competing for a substantial share of the commercially-insured lives that are located in the relevant market. Such providers cannot effectively compete against CareCore radiologist-owners without having access to a large share of the commercially-insured out-patient medical diagnostic imaging services market.

## HARM TO COMPETITION AND ANTITRUST INJURY

### A.    **Harm to Patients**

181.    Through their group boycott and market allocation, CareCore has harmed competition by reducing output and hampering innovation in the relevant downstream markets.

44

CareCore's anticompetitive conduct has resulted in the exclusion of competition from numerous superior, specialized, and state-of-the-art providers not currently part of the CareCore-controlled networks. It has also resulted in the exclusion of competition from superior, state-of-the-art providers within the CareCore-controlled networks who are not owners of CareCore.

182.    CareCore's illegal conduct prevents patients from accessing the superior services offered by excluded providers. In the case of EMR, patients have been prevented from accessing certain unique, medically necessary cardiac and other imaging services, of which EMR is the sole nonhospital out-patient provider in New York County. Referring physicians have been prevented from obtaining necessary information to diagnose and treat heart and other disease, reducing the quality of care to patients. Denied access to EMR's services, patients have been subject to unnecessary surgery or invasive/potentially harmful treatments.

183.    In addition, EMR has minimal to no wait times for its procedures. Referring physicians have reported that they are able to schedule a patient for imaging on the same day or at most in a few days at EMR. They have reported that hospitals – the only other source for some of the imaging services offered by EMR – have wait times of weeks or months for patients requiring these scans. Certain patients with time-sensitive conditions cannot afford to wait for a hospital scan.

184.    For patients requiring an assessment of valvular disease, PFO or iron buildup, the alternatives to a cardiac MRI at EMR are more invasive procedures like catheterization, esophageal catheterization, repeat liver biopsies or other potentially harmful and painful treatment.

185.    In addition, lack of access to cardiac MRI hampers the ability of a physician to accurately diagnose and treat heart disease. Cardiac MRI is often used to identify the correct surgical procedure and map the heart and arteries in preparation for surgery. Cardiac MRI has also

prevented unnecessary surgery. Lack of access to this important diagnostic tool has significantly diminished the quality of care patients receive.

186. Patients have also been deprived of low-dose CT scans. EMR's competing imaging centers did not have low-dose CT technology during the relevant time period, and exposed their patients to up to three times the level of radiation. Physicians have reported that patients have to go where their insurance allows them. Thus, those patients that EMR could have served, but for defendants' exclusionary conduct, were deprived of a low-dose alternative.

187. Referring physicians have reported that numerous patients requiring imaging at EMR who have Oxford, Aetna, Health Net, and HIP have been impacted by CareCore's exclusion of EMR. Some of these patients have gone so far as to pay for EMR's services themselves. Many patients have been treated free of charge by EMR because they were insured by health plans controlled by CareCore and because they required urgent care or the type of specialized services that only EMR could offer.

**B.** **Harm to Diagnostic Providers**

188. CareCore's conduct has reduced output of diagnostic imaging services not only by foreclosing EMR from competing in the relevant market, but also by foreclosing numerous other diagnostic imaging providers from effectively competing against CareCore's owners throughout the State of New York. CareCore has harmed these competing diagnostic imaging providers by driving some of them out of business altogether. Others have been forced to limit the introduction of new equipment at existing offices, thus visiting harm upon both the providers themselves as well as upon patients' interest in having a range of choices in healthcare providers. Those excluded providers that are not driven out of business lose a substantial number of referrals from physicians who, if not for CareCore, would send patients to such providers.

C.     **Harm to EMR**

189.     As with other providers excluded from the networks CareCore controls, EMR

loses a substantial amount of business from referring physicians who, if not for CareCore, would

send their patients to EMR. Referring physicians consistently have reported that they have

numerous patients they would have referred to EMR had it not been for its exclusion from the

CareCore-controlled networks.

190.     CareCore's steering has harmed EMR for patients covered by GHI and other ASO

contracts. CareCore does not control admission into these ASO-contracted networks and EMR can

be reimbursed under these plans. However, CareCore has used its control over the referral process

to steer patient referrals for highly reimbursed procedures to CareCore radiologist-owners and

away from non-owner providers such as EMR.

191.     Referring physician "one stop shopping" for radiology services has exacerbated

the foreclosure of EMR. As CareCore has admitted, by denying radiology practices – like EMR –

the ability to participate in CareCore-managed networks, these practices lose referrals not only for

patients directly controlled by CareCore, but for patients covered by insurance not managed by

CareCore.

192.     In addition, the effect of CareCore and its owners' boycott and market allocation

has been to severely limit EMR's ability to grow its existing non-cardiac imaging business over the

last 7 years. EMR has also been limited in its ability to expand the type of services it is able to

offer referring physicians. For example, EMR has had the opportunity to expand into PET-CT and

Ultrasound but has been unable to justify such an expansion (requiring significant expenditure on

equipment and other capital costs) due to its inability to serve patients covered by CareCore-

controlled networks.

193.     EMR also suffers harm to its reputation as many doctors and patients have asked why CareCore will not credential the site for HIP, Oxford, Aetna or Health Net. CareCore's exclusion of EMR from the networks it controls gives the impression that EMR is not the top-quality imaging center that it actually is.

194.     CareCore's exclusion of EMR from the networks it controls denies innovative, quality service to subscribers of health plans who are serviced by these networks and – in particular, to cardiac patients.

### D.     The Jury Finding the CareCore Harmed Competition

195.     There have been at least five (5) lawsuits against CareCore for the same underlying conduct as alleged here. While these other lawsuits are either pending or were settled out of court, on November 30, 2010, after a three-week trial, a jury in the Eastern District of New York found CareCore liable for violations of the antitrust laws and tortious interference with the prospective business relations of several radiologist competitors in *Stand-Up MRI of the Bronx, P.C. et al. v. CareCore National, LLC et al.*, No. 08 Civ. 2954 (LDW) (ETB) (E.D.N.Y.).

196.     The *Stand-Up MRI* trial included testimony from nearly 20 witnesses and approximately 200 exhibits. On September 29, 2011, Judge Wexler denied CareCore's post-trial motions. CareCore has appealed.

197.     In *Stand-Up MRI*, the jury found that CareCore harmed competition. Specifically the Jury found that CareCore and its owners "entered into a conspiracy" to engage in an "unreasonable restraint of trade" that caused the plaintiffs to "suffer[] injury to their business or property as a proximate result of the conspiracy." The jury also found that CareCore wrongfully interfered with the *Stand-Up MRI* plaintiffs' business prospects. The jury rejected CareCore's statute of limitations defense because while some of CareCore's anticompetitive acts – including

48

denying applications, such as occurred here – took place before the limitations period, other overt

anticompetitive acts, including other application denials, taken in furtherance of the conspiracy

occurred during the limitations period.  The jury awarded damages of $11,700,599 in *Stand-Up*

*MRI.*

198.     The case involved virtually the identical conduct as is at issue here.  There, the

CareCore owners in various counties of New York – including East River in Manhattan – had

conspired to exclude providers of imaging services that offered a unique technology not offered by

CareCore's owner-providers, namely, a type of MRI known as Stand Up MRI that enabled patients

to be scanned in a vertical position.  The same conspiracy at work here was at work in that case.

The CareCore owner-providers were able to avoid having to compete against providers of superior

or innovative imaging services – such as EMR – by boycotting their ability to access the insurance

company networks CareCore controls.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### *Per Se* or Rule of Reason Group Boycott

199.     Plaintiff repeats and realleges each and every allegation of this complaint as if

fully set forth herein.

200.     CareCore and its owners, collectively possess and exercise market power in the

relevant product and geographical markets identified in this complaint.

201.     These contracts, combinations or conspiracies have caused substantial

anticompetitive effects.  They have excluded competition from non-CareCore radiologist-owners,

have restricted the variety of diagnostic imaging services available to consumers, have reduced the

quality of medical care to patients, and have artificially reduced output of diagnostic imaging services in the relevant market.

202.     These contracts, combinations or conspiracies have no legitimate business purpose. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

203.     As a result of these violations of Section 1 of the Sherman Act, plaintiff has been injured in its business and property in an amount not presently known, but which is, at a minimum, millions of dollars, prior to trebling.

204.     As a result of these violations of Section 1 of the Sherman Act, plaintiff also faces irreparable injury. Such violations and the effects thereof are continuing and will continue unless injunctive relief is granted. Plaintiff has no adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### *Per Se* or Rule of Reason Market Allocation

205.     Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

206.     Each of the defendants, along with their co-conspirators, have entered into continuing illegal contracts, combinations or conspiracies in restraint of trade, the purpose and effect of which are to steer non-CareCore radiologist-owners and/or to provide and allocate the market for commercially-insured out-patient diagnostic imaging services among themselves. These contracts, combinations, agreements or conspiracies are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1. They are also illegal under antitrust's Rule of Reason standard.

207.     These contracts, combinations or conspiracies have caused substantial anticompetitive effects. They have excluded competition from non-owner providers, have

restricted the variety of diagnostic imaging services choices available to consumers, have reduced

the quality of medical care to patients, and have artificially reduced output of diagnostic imaging

services in the relevant market.

208.     These contracts, combinations or conspiracies have no legitimate business

purpose.  They achieve no legitimate efficiency benefit to counterbalance the anticompetitive

effects that they cause.

209.     As a result of these violations of Section 1 of the Sherman Act, plaintiff has been

injured in its business and property in an amount not presently known, but which is, at a minimum,

millions of dollars, prior to trebling.

210.     As a result of these violations of Section 1 of the Sherman Act, plaintiff also faces

irreparable injury.  Such violations and the effects thereof are continuing and will continue unless

injunctive relief is granted.  Plaintiff has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF

### Violations of the Donnelly Act

211.     Plaintiff repeats and realleges each and every allegation of this complaint as if

fully set forth herein.

212.     At all times relevant to this Complaint, each of the defendants, together with their

co-conspirators, has engaged in a contract, agreement, arrangement and combination in

unreasonable restraint of trade and commerce in violation of the Donnelly Act, §§ 340 *et seq.* of

the New York General Business Law.

213.     This contract, combination, arrangement and agreement, consisted of, among

other things, an agreement by defendants and their co-conspirator to eliminate competition from

non-owner providers in providing services to patients, the effect of which is to steer patients to

51

CareCore radiologist-owners and to allocate the market for commercially-insured out-patient diagnostic imaging services in the relevant geographic market among themselves.

214.    As a result of this conspiracy, defendants restrained competition in the marketplace, thereby preventing plaintiff from competing in a free and open marketplace, and hindering the delivery of their specialized and beneficial medical services to the community.

215.    Defendants' unlawful activities are a *per se* violation of the Donnelly Act.

216.    Defendants' unlawful activities also violate the Donnelly Act under the Rule of Reason.

217.    These contracts, combinations or conspiracies have caused substantial anticompetitive effects. They have excluded competition from non-CareCore radiologist-owners, have restricted the variety of diagnostic imaging services available to consumers, have reduced the quality of medical care to patients, and have artificially reduced output of diagnostic imaging services in the relevant market.

218.    These contracts, combinations or conspiracies have no legitimate business purpose. They achieve no legitimate efficiency benefit to counterbalance the anticompetitive effects that they cause.

219.    As a result of these violations of the Donnelly Act, plaintiff has been injured in its business and property in an amount not presently known, but which is, at a minimum, millions of dollars, prior to trebling.

220.    Pursuant to § 340(5) of the New York General Business Law, plaintiff is entitled to recover threefold its damages plus costs and attorneys' fees from each of the defendants and to injunctive relief.

52

## FOURTH CLAIM FOR RELIEF

### Tortious Interference with Prospective Economic Advantage

221.   Plaintiff repeats and realleges each and every allegation of this complaint as if fully set forth herein.

222.   EMR provides patients imaging services in Manhattan.  EMR competes against CareCore radiologist-owner at this location.

223.   For EMR to be reimbursed for providing these services to patients covered under commercial health insurance plans, plaintiff must be a participating provider with those plans.

224.   The major plans, Oxford, Aetna, HIP, and Health Net, cover a large percentage of the covered lives in those parts of Manhattan and the surrounding area where plaintiff provides its services.

225.   These major plans have entered into exclusive agreements with CareCore and unless CareCore approves a facility, such as EMR, to be a member of the CareCore-controlled networks, that facility would not be financially viable.

226.   Defendants know that plaintiff needs to be in the CareCore-controlled networks to be reimbursed for services provided to patients covered by the major plans.

227.   Defendants intentionally interfered with plaintiff's prospective economic advantage to be realized from providing these services to patients by improperly and illegally engaging in the conspiratorial conduct described above to eliminate and exclude competition from plaintiff, steering patients to CareCore radiologist-owners and engaging in horizontal market allocation to favor the CareCore radiologist-owners.

228.   EMR has been harmed in its business and property as a result of defendants' tortious interference, losing income from not being reimbursed for services provided and/or from not receiving physician referrals due to lack of CareCore-controlled network participation.

229.     Defendants' conduct is malicious, oppressive and done with the sole intent of
harming plaintiff.

230.     Defendants' conduct is without justification or privilege.

231.     As a result of defendants' wrongful conduct, each defendant is liable to plaintiff
for its damages, in such amounts as will be determined at trial.  Plaintiff is also entitled to recover
punitive damages.

## RELIEF SOUGHT

WHEREFORE, plaintiff respectfully requests the following relief:

A.     That the Court apply collateral estoppel to the jury verdict in *Stand-Up MRI of the
Bronx, P.C. et al. v. CareCore National, LLC et al.*, No. 08 Civ. 2954 (LDW) (ETB) (E.D.N.Y.),
and other orders or judgments presently existing or forthcoming in that case, as applicable, and
enter an order that: (1) CareCore's network admission procedures violated state and federal law;
(2) the relevant product market is the market for commercially-insured out-patient radiology
services; (2) CareCore exercised market power; (3) CareCore entered into a conspiracy; (4)
CareCore's conspiracy harmed competition by reducing output and hampering innovation in the
relevant market; and (5) CareCore tortiously interfered with plaintiff's prospective economic
advantage

B.     That the Court declare, adjudge and decree that defendants have committed the
violations of federal and state law alleged herein;

C.     That defendants, their directors, officers, employees, agents, successors, and
assigns be enjoined and restrained from, in any manner, directly or indirectly, (1) precluding
EMR from offering various radiological services to subscribers covered by commercial insurers
that contract with CareCore; (2) "steering" patients that have been referred to EMR away from it

and towards CareCore radiologist-owners; and (3) committing any other violations of federal and state antitrust laws.

     D.      That defendants be ordered to admit EMR to the Oxford, Aetna, HIP, and Health Net networks managed by defendants.

     E.      That defendants provide plaintiff with damages, in an amount to be proven at trial, to be trebled according to law, plus interest – including prejudgment interest – to compensate them for the damages they incurred from defendants' violations of the federal antitrust laws.

     F.      That the Court award plaintiff attorneys' fees and costs of suit, and such other and further relief this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

     232.      Plaintiff demands a trial by jury.

DATED: December 23, 2011          CONSTANTINE CANNON LLP

                    By: _____
                          Matthew L. Canton
                          Axel Bernabe
                          Jean Kim
                    335 Madison Avenue, 9th Floor
                    New York, New York  10017
                    Telephone:  (212) 350-2700
                    Facsimile:  (212) 350-2701

                    *Attorneys for Plaintiff Eastside Medical Radiology, PLLC, d/b/a Carnegie Hill Radiology and Advanced Cardiovascular Imaging*